# EXHIBIT A

Thomas L. Simek, tsimek@cftc.gov
Jennifer J. Chapin, jchapin@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700

SEAN D. REYES (7969)
Utah Attorney General
Thomas M. Melton (4999), tmelton@agutah.gov
Robert Wing (4445), rwing@agutah.gov
Jennifer Korb (9147), jkorb@agutah.gov
Paula Faerber (8518), pfaerber@agutah.gov
Assistant Attorneys General
Attorneys for Plaintiff
STATE OF UTAH DIVISION OF SECURITIES
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
(801) 366-0310

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>STATE OF UTAH DIVISION OF SECURITIES, through Attorney General, Sean D. Reyes,<br><br>     Plaintiffs,<br><br>v.<br><br>RUST RARE COIN INC., a Utah corporation, GAYLEN DEAN RUST, an individual, DENISE GUNDERSON RUST, an individual, and JOSHUA DANIEL RUST, an individual<br><br>     Defendants; | FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF<br><br><br>Case No. 2:18-CV-00892-TC<br><br>Judge: Tena Campbell |

1

and

ALEESHA RUST FRANKLIN, an individual, R LEGACY RACING INC, a Utah corporation, R LEGACY ENTERTAINMENT LLC, a Utah limited liability company, and R LEGACY INVESTMENTS LLC, a Utah limited liability company.

Relief Defendants.

Plaintiffs Commodity Futures Trading Commission ("CFTC") and the State of Utah Division of Securities ("State of Utah"), by and through their undersigned attorneys, hereby allege as follows:

## I. SUMMARY

1.     For over thirty years, Gaylen Dean Rust ("Rust") has owned and operated Rust Rare Coin, Inc. ("RRC"), a retail coin shop in Salt Lake City, Utah that sold customers rare coins and precious metals. From at least as early as 2008 and continuing through the present (the "Relevant Period") Rust, RRC, Denise Gunderson Rust ("Denise Rust") and Joshua Daniel Rust ("Joshua Rust") (collectively, "Defendants") also have engaged in a massive scheme to defraud over 430 individuals—from Utah and at least sixteen other states. Defendants Rust and RRC have fraudulently solicited over $200 million from investors between May 2013 and August 2018 alone, and throughout the Relevant Period they have tricked investors into believing that defendants Rust and RRC were pooling this money for the purpose of entering into contracts of sale for silver, a commodity in interstate commerce (the "Silver Pool"). Defendants Rust and

RRC told investors and prospective investors that they would sell silver held in the pool as market prices rose and buy silver for the pool as market prices fell; thereby increasing the amount of silver held in the Silver Pool, as well as the value of each investor's share in that pool. Defendants Rust and RRC told investors and prospective investors in the Silver Pool that by trading silver in this manner, they generated extraordinarily high returns, averaging twenty to twenty-five percent per year and sometimes as high as forty percent per year or more. Defendants Rust and RRC provided investors with account statements that showed defendants Rust and RRC selling silver at a higher price than they subsequently repurchased it on every trade they executed on behalf of the Silver Pool—creating the impression that the Silver Pool was a highly profitable investment. Defendants Rust and RRC told investors that defendants Rust and RRC possessed approximately seventy-seven to eighty million dollars of silver on behalf of the Silver Pool and stored this silver at Brink's, Incorporated ("Brink's") depositories in Salt Lake City, Utah and Los Angeles, California.

2.     The Silver Pool was a sham. Defendants Rust and RRC did not use contributions from investors to purchase silver for the Silver Pool. Instead, defendants Rust and RRC misappropriated investor funds and used these funds to make payments to other investors, transfer money to other companies owned by Rust, and pay personal expenses. Defendants Rust and RRC never had a trading account in which they sold and bought back physical silver for the Silver Pool, as falsely claimed in the account statements they provided to investors. Defendants Rust and RRC never earned the returns they touted to investors, and the payments they made to investors throughout the Relevant Period consisted of funds provided by other Silver Pool investors, not from profits generated from trading physical silver—in other words payments in

3

the manner of a Ponzi scheme. Although defendants Rust and RRC transferred a small portion of investor contributions to accounts at several precious metals dealers, defendants Rust and RRC never purchased and stored anything approaching the approximately seventy-seven to eighty million dollars of silver they claimed to be storing at Brink's depositories in Salt Lake City and/or Los Angeles.

3.     Throughout the Relevant Period, defendants transferred large amounts of money they solicited and received from Silver Pool investors to defendant Denise Gunderson Rust ("Denise Rust") and Relief Defendants Aleesha Rust Franklin ("Aleesha Franklin"), R. Legacy Entertainment, LLC ("R. Legacy Entertainment"), R. Legacy Racing Inc. ("R. Legacy Racing"), and R. Legacy Investments LLC ("R. Legacy Investments") (collectively, "Relief Defendants"). Relief Defendants used money contributed by investors to fund various personal and unrelated business expenses.

4.     In carrying out their scheme defendants Rust and RRC received substantial assistance from defendants Denise Rust and Joshua Daniel Rust ("Joshua Rust"). Both Denise Rust and Joshua Rust knew that the Silver Pool was a fraudulent scheme, that defendants Rust and RRC had made and continue to make misrepresentations to investors in the Silver Pool, and that defendants Rust and RRC misappropriated funds contributed by Silver Pool investors. Defendant Denise Rust assisted in defendants Rust and RRC's misappropriation of investor funds by signing checks issued to investors knowing that these checks were Ponzi payments involving money contributed by other investors and by transferring money from the bank accounts defendants Rust and RRC used to receive investor funds to one or more Relief Defendants. Defendant Joshua Rust managed the day-to-day operations of defendant RRC and

4

also signed checks issued to investors that were Ponzi payments involving money contributed by other investors. Defendant Joshua Rust, as manager of RRC, transferred money from defendant RRC's operating accounts knowing that this money would be used by defendants Rust and RRC for the purpose of making Ponzi payments to Silver Pool investors. At times during the Relevant Period, Defendant Joshua Rust also requested and received transfers of money he knew was contributed by Silver Pool investors for the purpose of funding the operating expenses of defendant RRC.

5. Defendants Rust and RRC's fraudulent scheme has been ongoing at least through November 15, 2018. In the first eight months of 2018, defendants Rust and RRC have received at least $42 million from Silver Pool investors and paid approximately $26 million back to Silver Pool investors. Defendants Rust and RRC have attempted to solicit new investors in the Silver Pool at least as recently as October 8, 2018.

6. By engaging in this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in violations of the anti-fraud provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2018), as well as the Utah Uniform Securities Act ("UUSA"), § 61-1-1 to 61-1-32.

7. By knowingly and willfully signing and issuing checks and/or initiating wire transfers constituting Ponzi payments to investors, transferring contributions from Silver Pool investors to fund Rust's other businesses or RRC's coin shop business, and commingling the money contributed by Silver Pool investors with the funds of these other businesses, defendants Denise Rust and Joshua Rust participated in and aided and abetted defendants Rust and RRC's

5

fraudulent scheme. Defendants Denise Rust and Joshua Rust are thus responsible as if they were

principals under Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012), for defendants Rust and

RRC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3). Defendants Denise Rust

and Joshua Rust also engaged in acts, practices, or a course of business that operated as a deceit

on other persons in violation of Section 61-1-1(3) of the UUSA.

      8.     Unless restrained and enjoined by the Court, Defendants are likely to continue

engaging in the acts and practices alleged in this Complaint or in similar acts and practices, and

funds they have obtained fraudulently may be misappropriated or otherwise dissipated.

      9.     Plaintiffs bring this action pursuant to Sections 6c and 6d of the Act, 7 U.S.C.

§§ 13a-1, 13a-2 (2012), and Section 61-1-20 of the UUSA to enjoin Defendants' unlawful acts

and practices and to compel Defendants' compliance with the Act and the UUSA.

## II.  JURISDICTION AND VENUE

      10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

(2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012),

authorizes the Commission to seek injunctive and other relief against any person whenever it

appears to the Commission that such person has engaged, is engaging, or is about to engage in

any act or practice constituting a violation of any provision of the Act or any rule, regulation, or

order thereunder. Section 6d(1) of the Act, 7 U.S.C. § 13a-2(1) (2012), authorizes the State of

Utah to bring a suit in the district courts of the United States to seek injunctive and other relief

against any person whenever it appears to the Attorney General of Utah, or the administrator of

6

the securities laws of Utah, or such other official that Utah may designate, that the interests of the residents of Utah have been, are being, or may be threatened or adversely affected because of violations of the Act or Regulations.

11. This Court has supplemental jurisdiction over the State of Utah's claims under Utah law pursuant to 28 U.S.C. § 1367(a) (2012).

12. Venue lies properly in this District pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act, the Regulations, and Utah law occurred, are occurring, or are about to occur within this District, among other places.

### III. PARTIES

13. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

14. Plaintiff **State of Utah Division of Securities** is the administrator of the securities laws of the state of Utah and is authorized under Section 6d of the Commodity Exchange Act, 7 U.S.C. § 13a-2 (2012), and Utah law, including Section 61-20-20(2)(a) of the UUSA, to bring this action on behalf of the State of Utah and its citizens to enforce Utah law (including the UUSA), the Act, and Regulations.

15. Defendant **RRC** is a Utah corporation incorporated on October 5, 1983, with its principal place of business at 242 East 300 South, Salt Lake City, Utah 84111. RRC operates as a coin and precious metal dealer in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, RRC participated in the acts

7

and practices set forth in this Complaint. RRC, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. RRC has never been registered with the CFTC in any capacity. RRC has never been registered in any capacity within the securities industry in the State of Utah. RRC has never registered a securities offering in the State of Utah, it is not eligible for any applicable exemption from registration, and its securities are not federally-covered securities for which a notice filing has been made.

16. Defendant **Rust** is an individual who resides in Layton, Utah. Rust is the sole owner of RRC and serves as RRC's President and sole Director. At all times material to this Complaint, acting alone or in concert with others, Rust formulated, directed, controlled, had the authority to control, or participated in the acts and practices of RRC described in this Complaint. Rust, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. Rust has never been registered with the CFTC in any capacity. Rust has never been registered in any capacity within the securities industry in the State of Utah.

17. Defendant **Denise Rust** is an individual who resides in Layton, Utah. Denise Rust is Rust's spouse. She serves as RRC's Secretary and has signatory authority on several of RRC's bank accounts. Denise Rust assists in the day-to-day operations of RRC and Rust's other business entities. During the Relevant Period, Denise Rust received payments from RRC into her personal bank accounts that included funds contributed to RRC by investors in the Silver Pool for the purpose of investing in the Silver Pool. Denise Rust has never been registered with the CFTC in any capacity. Denise Rust has never been registered in any capacity within the securities industry of the State of Utah.

8

18.     Defendant **Joshua Rust** is a resident of Draper, Utah and the son of Rust and
Denise Rust. Joshua Rust holds himself out as the manager of RRC, runs the day-to-day
operations of RRC, and he has signatory authority on several RCC bank accounts. During the
Relevant Period, Joshua Rust received money contributed by investors in the Silver Pool into the
RRC bank account used to fund RRC's operating expenses, which included Joshua Rust's salary
and other compensation. Joshua Rust has never been registered with the CFTC in any capacity.
Joshua Rust has never been registered in any capacity within the securities industry of the State
of Utah.

19.     Relief Defendant **Aleesha Franklin** is a resident of Homer, Alaska and the
daughter of Rust and Denise Rust. During the Relevant Period, Aleesha Franklin received
payments from RRC into her personal bank account that included funds contributed to RRC by
investors in the Silver Pool for the purpose of investing in the Silver Pool.

20.     Relief Defendant **R Legacy Racing** is a Utah corporation incorporated on April
30, 2007, with its principal place of business at 2815 W. Gordon Avenue, Layton, Utah 84041.
Rust owns R Legacy Racing, and Rust and Denise Rust serve as its directors. During the
Relevant Period, R Legacy Racing received payments from RRC into its bank accounts that
included funds contributed to RRC by investors in the Silver Pool for the purpose of investing in
the Silver Pool.

21.     Relief Defendant **R Legacy Entertainment** is a Utah limited liability company
incorporated on December 1, 2009, with its principal place of business at 242 East 300 South,
Salt Lake City, Utah 84111. Rust and Denise Rust are the only members of R Legacy
Entertainment. During the Relevant Period, R Legacy Racing received payments from RRC into

9

its bank accounts that included funds contributed to RRC by investors in the Silver Pool for the

purpose of investing in the Silver Pool.

22.     Relief Defendant **R Legacy Investments** is a Utah limited liability company

incorporated on March 27, 2002, with is principal place of business at 2815 West Gordon

Avenue, Layton, Utah 84041.  Rust is the sole member and manager of R Legacy Investments.

During the Relevant Period, R Legacy Investments received payments from RRC into its bank

accounts that included funds contributed to RRC by investors in the Silver Pool for the purpose

of investing in the Silver Pool.

## IV.  FACTS

**A.     Defendants Engaged in a Scheme To Defraud Silver Pool Investors by
        Making False Representations and Omitting Material Facts,
        Misappropriating Investor Funds, and Providing False Account Statements**

> 1.     Defendants Rust and RRC Solicited Individual Investors To Contribute to
>        a Pooled Investment Involving Contracts of Sale for Silver, a Commodity
>        in Interstate Commerce

23.     Defendants Rust and RRC promoted the Silver Pool as an exclusive investment

opportunity reserved for individual investors with a personal or business connection to Rust.

Defendants Rust and RRC solicited friends or business associates of Rust and/or customers of

RRC to contribute money to the Silver Pool.  These friends and customers in turn spread word of

the Silver Pool and the investment returns defendants Rust and RRC were purportedly generating

to certain friends and family, some of whom also gave money to defendants Rust and RRC for

the Silver Pool.  Defendants pooled the contributions they received from investors in two bank

accounts in the name of RRC.

24.     Defendants Rust and RRC told investors and prospective investors that they were

10

using the money contributed to the Silver Pool to purchase and store physical silver for investment. Under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012), as well as Section 61-1-13(f)(ii) of the UUSA, silver is a statutorily-defined commodity. Defendants Rust and RRC used the mails or other instrumentalities of interstate commerce to: (1) receive checks from Silver Pool investors in the pool; (2) receive into their bank accounts wire transfers from Silver Pool investors in the pool; (3) disseminate false account statements to Silver Pool investors.

25.     Defendants Rust and RRC's Silver Pool, which they operated and marketed to investors and prospective investors, is an investment contract, which is a security under Section 61-1-13(s) of the UUSA. Silver Pool investors have no role in defendants Rust and RRC's business operations and only provide investment funds.

26.     Defendants Rust and RRC did not provide Silver Pool investors with a written agreement or contract setting forth the terms of the investment. In addition, defendants Rust and RRC did not provide Silver Pool investors with a disclosure document such as an offering circular or prospectus. Silver Pool investors received only a single-page receipt documenting the size of their contribution to the Silver Pool.

27.     Defendants Rust and RRC have been soliciting and receiving contributions for the Silver Pool from investors and prospective investors since at least 2003. Since 2013, defendants Rust and RRC have received over $200 million in contributions from investors for the Silver Pool.

11

2. Defendants Rust and RRC Falsely Represented that They Used Contributions to the Silver Pool To Purchase and Trade Silver; Instead, Defendants Misappropriated this Money for Personal Expenses and To Fund Rust's Other Businesses

28. Defendants Rust and RRC told investors and prospective investors that they used money contributed to the Silver Pool to purchase physical silver, which they stored at one of two Brink's storage facilities either in Salt Lake City, Utah or Los Angeles, California. In 2018, defendants Rust and RRC claimed that they held between seventy-seven and eighty million dollars in the Silver Pool, all of which was in the form of physical silver stored at these two Brink's depositories. Defendants Rust and RRC represented that investors could liquidate their investments and obtain the cash value of their share in the Silver Pool at any time. Defendants Rust and RRC further represented to investors that defendants Rust and RRC would sell silver held in the Silver Pool to fund any such liquidation request.

29. Defendants Rust and RRC claimed that they generated profits for investors by selling silver they held in the Silver Pool either when market prices for physical silver began to rise or immediately before those prices began to decline. Defendants Rust and RRC claimed that after market prices for silver declined, they used the proceeds from their sale of silver to purchase a larger quantity of silver at a lower price. As a result of this trading, defendants Rust and RRC claimed that they were able to increase the number of ounces of silver held in the Silver Pool and thus the value of each investor's share in the Silver Pool. Defendants Rust and RRC told investors and prospective investors that defendants Rust and RRC sold and repurchased approximately fifty percent of the total amount of silver held in the Silver Pool in each trade.

12

30.     Defendants Rust and RRC told some Silver Pool investors and prospective investors that they were able to consistently sell silver at higher prices and purchase silver back at lower prices because they had advance knowledge of when market prices of silver would decline. Specifically, Rust claimed that he had a personal relationship with a commodity analyst at a large global bank and that Rust obtained information from this analyst regarding when that bank and other market participants planned to sell large quantities of physical silver, driving down market prices.

31.     Defendants Rust and RRC told investors and prospective investors that by trading silver in this manner, defendants Rust and RRC were able to generate high rates of return for the Silver Pool. Specifically, defendants Rust and RRC often told Silver Pool investors and prospective investors that defendants Rust and RRC were able to generate "consistent" returns of twenty to twenty-five percent through their selling and subsequent repurchase of silver. Defendants Rust and RRC told some Silver Pool investors and prospective investors that they had generated returns as high as forty percent between 2013 and 2018. Further, defendants Rust and RRC told some Silver Pool investors that their investments "doubled" in 2014.

32.     Defendants Rust and RRC represented to Silver Pool investors and prospective investors that Rust had an account with HSBC Bank ("HSBC") through which Rust traded the silver held in the Silver Pool. Defendants Rust and RRC also told these investors and prospective investors that after selling and repurchasing silver through their HSBC account, defendants Rust and RRC received the additional silver they obtained through these trades at Brink's facilities in Salt Lake City, Utah and Los Angeles, California.

33.     The statements defendants Rust and RRC made to solicit investors and

13

prospective investors to contribute to the Silver Pool were false. Despite receiving over $200 million from Silver Pool investors since 2013, representing to Silver Pool investors that they used all of that money to purchase physical silver, and further representing to Silver Pool investors that they increased the amount of silver held in the Silver Pool through trading, defendants Rust and RRC currently possess only approximately $200,000 worth of physical silver. Defendants Rust and RRC do not currently store any physical silver at Brink's facilities in Salt Lake City, Utah, Los Angeles, California, or anywhere else. Brink's has never had a contract to store silver for RRC or Rust. In addition, storing the $77 million to $80 million worth of physical silver defendants Rust and RRC claimed to hold in the Silver Pool would cost in excess of $100,000 per year in annual storage fees. Defendants Rust and RRC have never paid Brink's any annual storage fees, let alone annual storage fees approaching $100,000. Although at one time prior to 2016 Brink's stored approximately $1 million worth of physical silver for defendants Rust and RRC, this amount is far less than the amount of physical silver defendants Rust and RRC claimed to hold at the time and the approximately $200 million defendants Rust and RRC have received from Silver Pool investors since 2013.

34. Furthermore, defendants Rust and RRC did not trade silver in the manner they described to Silver Pool investors. Defendants Rust and RRC never had a trading account with HSBC Bank ("HSBC") through which they traded physical silver, as they represented to investors and prospective investors.

35. Instead, defendants Rust and RRC misappropriated funds invested in the Silver Pool. Defendants Rust and RRC used money contributed by Silver Pool investors to pay personal expenses, such as, for example, mortgage payments on the home of a family member of

14

Rust. Defendants Rust and RRC also used money contributed by Silver Pool investors to make payments to other investors in the pool, in the manner of a Ponzi scheme. Specifically, after receiving a new deposit from a Silver Pool investor, defendants Rust and RRC frequently made smaller payments to several other Silver Pool investors out of the same account without ever transferring funds to or from a trading account or any other account that could be used to buy or sell silver or other precious metals.

36.     In addition, defendants Rust and RRC transferred money contributed by Silver Pool investors to other entities owned by Rust, including, but not limited to, Relief Defendants R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments. R. Legacy Entertainment did not own silver or other precious metals, or own any trading or other accounts used to buy or sell silver or other precious metals. Instead, R. Legacy Entertainment operated a variety of businesses and charitable activities having no connection to the purchase and sale of silver, including a music recording studio, a video production business, and a catering and event planning business. R. Legacy Racing did not own silver or own any trading or other accounts used to buy or sell silver or other precious metals. Instead, R. Legacy Racing owned thoroughbred horses.

37.     Defendants also transferred money contributed by Silver Pool investors to several personal bank accounts, including personal bank accounts owned by Rust, Defendant Denise Rust, and Relief Defendant Aleesha Franklin, where it was used for a variety of personal expenses.

38.     For example, between January 1, 2018, and August 31, 2018, defendants Rust and RRC received over $42 million in new contributions from Silver Pool investors and deposited all

15

these contributions in an account at Zion's Bank held in the name of RRC ending in 7496 (the "7496 Account"). During this time period, defendants Rust and RRC made approximately $28 million in payments from the 7496 Account to Silver Pool investors.

39.     Between January 1, 2018, and August 31, 2018, defendants Rust and RRC transferred approximately $7 million from the 7496 Account to RRC's other Zion's Bank accounts, where it was commingled with the revenue and expenses associated with RRC's coin shop business managed by defendant Joshua Rust. Defendants Rust, RRC, and Joshua Rust used $15,173,104 from a Zion's Bank account in the name of RRC ending in 3564 (the "3564 Account") to purchase precious metals and coins, both from wholesale precious metals dealers and individuals. During this same time period, defendants Rust, RRC, and Joshua Rust also sold $9,338,421 in precious metals and coins to both wholesale precious metals dealers and individuals. During this time period, defendants Rust, RRC, and Joshua Rust had net purchases of precious metals amounting to $5,834,683, despite having received over $42 million from individuals for the purpose of purchasing precious metals.

40.     In addition, from January 1, 2018, to August 31, 2018, defendants Rust and RRC transferred approximately $4.9 million from the 7496 Account to Relief Defendant R. Legacy Entertainment. Defendants Rust and RRC transferred approximately $300,000 from the 7496 Account to Relief Defendant R. Legacy Racing. Defendants Rust and RRC transferred approximately $654,920 from the 7496 Account to Relief Defendant R. Legacy Investments. Because the amounts each of these Relief Defendants received from the 7496 Account far exceed the approximately $48,000 Defendants Rust and RRC received into the 7496 Account from sources other than Silver Pool investors, the money transferred to Relief Defendants from the

16

7496 Account consists almost entirely of money contributed by Silver Pool Investors. Relief

Defendants R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments have no

legitimate claim to the funds that they received from this Zion's Bank account.

41.     From January 1, 2018, to August 31, 2018, defendants Rust and RRC transferred

approximately $130,308 from the 7496 Account to defendant Denise Rust. Again, the money

transferred to defendant Denise Rust consisted largely of money contributed by Silver Pool

investors. Defendant Denise Rust has no legitimate claim to the funds that she received from

this Zion's Bank account.

42.     From January 1, 2018, to August 31, 2018, Defendants Rust and RRC transferred

approximately $121,500 from the 7496 Account to Relief Defendant Aleesha Franklin. Again,

the money transferred to Aleesha Franklin consisted largely of money contributed by Silver Pool

investors. Aleesha Franklin has no legitimate claim to the funds that she received from this

Zion's Bank account.

43.     During this same time period, defendants Rust and RRC transferred

approximately $292,384 from the 7496 Account to a Zion's Bank account in the name of

defendant Joshua Rust (the "Joshua Rust Account") and received approximately $407,735 from

the Joshua Rust Account into the 7496 Account. This resulted in a net receipt of $115,351 from

the Joshua Rust Account. During this same time period, defendants Rust and RRC transferred

approximately $2,030,206 from RRC's other bank accounts at Zion's Bank, including the 3564

Account, to the Joshua Rust Account and received approximately $1,786,865 from the Joshua

Rust Account. As a result, defendants Rust and RRC paid a net total of $243,341 from RRC's

other bank accounts, including the 3564 Account, to the Joshua Rust Account. Joshua Rust has

17

no legitimate claim to the funds he received from these other Zion's Bank accounts.

44.     Defendants Rust and RRC knew that the statements and representations described above that they made to Silver Pool investors and prospective investors were false when they made them. Defendants Rust and RRC intended to and did misappropriate the vast majority of Silver Pool investor funds they received during the Relevant Period.

45.     In addition to the false statements described above, defendants Rust and RRC omitted material facts when soliciting investors and prospective investors for the Silver Pool that were necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, defendants Rust and RRC omitted the following:

a.     That defendants Rust and RRC would use Silver Pool investor funds to pay for personal and business expenses;

b.     That Silver Pool redemptions would be paid out of money contributed by other investors and not sales of silver actually held by defendants Rust and RRC in storage facilities;

c.     That Defendants Rust and RRC would use Silver Pool investor funds to fund the activities of other businesses owned by Rust;

d.     That defendants Rust and RRC were not licensed to sell securities, and the securities were not registered or exempt from registration; and

e.     All of the information typically included in disclosure documents (offering memoranda or prospectus) that accompany the sale of securities.

46.     Throughout the Relevant Period, defendants Rust and RRC solicited most, if not all, investors and prospective investors in the Silver Pool using some variant of the fraudulent statements and misrepresentations described above. In addition, defendants Rust and RRC omitted the facts described above to most, if not all, investors and prospective investors in the Silver Pool in the course of soliciting contributions from them.

18

3.   Denise Rust Defrauded Investors By Making Ponzi Payments and
Transferring Misappropriated Funds to Relief Defendants

47.   During the Relevant Period, defendant Denise Rust knew that the Silver Pool was

a fraudulent scheme. Specifically, defendant Denise Rust knew that defendants Rust and RRC

misrepresented to investors that they used money contributed by investors to the Silver Pool to

purchase Silver. Defendant Denise Rust was a signatory on the 7496 Account that defendants

Rust and RRC used to receive investor funds and had access to statements and online transaction

ledgers for the 7496 Account. Defendant Denise Rust observed that money received from

investors in the Silver Pool into the 7496 Account was being used by defendants Rust and RRC

to make payments to other investors and was not being used to purchase silver.

48.   Defendant Denise Rust assisted defendants Rust and RRC in carrying out their

fraudulent scheme by preparing and signing checks and initiating wire transfers to investors that

represented Ponzi payments. When defendant Denise Rust prepared and signed these checks and

initiated these wire transfers, she knew that the money for these payments was coming from the

contributions of other investors in the Silver Pool, not from the sale of silver. In preparing and

signing these checks and initiating these wire transfers, defendant Denise Rust intended to assist

defendants Rust and RRC make Ponzi payments to Silver Pool investors.

49.   Defendant Denise Rust also knew that defendants Rust and RRC misappropriated

money contributed by Silver Pool investors by using this money to fund the operations of Relief

Defendants R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments.

Furthermore, defendant Denise Rust knew, from discussions with defendant Rust, that Relief

Defendants R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments were

dependent on money contributed by Silver Pool investors to fund their business operations.
Defendant Denise Rust assisted defendants Rust and RRC in misappropriating money
contributed by Silver Pool investors by using her access and control over the 7496 Account and
the bank accounts of Relief Defendant R. Legacy Racing to transferring money contributed by
Silver Pool investors into the 7496 Account to R. Legacy Racing. During the Relevant Period,
defendant Denise Rust initiated at least twenty transfers of money from the 7496 Account to R.
Legacy Racing. In doing so, defendant Denise Rust intended to assist defendants Rust and RRC
in misappropriating money contributed by Silver Pool investors.

    4.    Joshua Rust Defrauded Investors by Making Ponzi Payments.

    50.    During the Relevant Period, defendant Joshua Rust managed RRC's coin shop
business. As manager of RRC's coin shop business, defendant Joshua Rust had access to and
signatory authority over RRC's bank accounts, including the 7496 Account. As manager of
RRC's coin shop business, defendant Joshua Rust observed the flow of funds between RRC's
bank accounts. Defendant Joshua Rust was also responsible for ordering precious metals to
supply inventory for RRC's coin shop business and fulfill orders placed by customers of RRC's
coin shop business, and typically funded such transactions from 3564 Account.

    51.    Defendant Joshua Rust knew that the Silver Pool was a fraudulent scheme.
Defendant Joshua Rust knew that defendants Rust and RRC did not use money contributed by
investors to the Silver Pool to purchase and trade silver. Defendant Joshua Rust knew that
defendants Rust and RRC did not hold silver at Brink's or elsewhere anywhere near the amount
defendants Rust and RRC claimed to hold on behalf of investors in the Silver Pool. Defendant
Joshua Rust further knew that defendants Rust and RRC did not fund investor withdrawal

requests by selling silver, but simply used new money contributed by other investors to fund these withdrawal requests. Defendant Joshua Rust knew and understood that defendant Rust was misappropriating money contributed by Silver Pool investors and using this money to support the operations of Rust's other businesses, including R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments. Furthermore, defendant Joshua Rust knew, from discussions with defendant Rust, that Relief Defendants R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments were dependent on money contributed by Silver Pool investors to fund their business operations

52.     In addition, defendant Joshua Rust knew that money defendants Rust and RRC received from investors was commingled with the money RRC generated through its coin shop business. Defendant Joshua Rust further knew that defendant Rust was using RRC's name, logo, and letterhead to solicit investors and prospective investors for the Silver Pool.

53.     Defendant Joshua Rust assisted defendants Rust and RRC in carrying out their fraudulent scheme by signing and issuing checks to Silver Pool investors that represented Ponzi payments. When defendant Joshua Rust prepared and signed these checks, he knew that the money for these payments was coming from the contributions of other investors in the Silver Pool, not from the sale of silver. In preparing and signing these checks, defendant Joshua Rust intended to assist defendants Rust and RRC make Ponzi payments to Silver Pool investors.

54.     Defendant Joshua Rust also assisted defendants Rust and RRC in carrying out their fraudulent scheme by funding Ponzi payments to Silver Pool investors through transfers from the bank accounts RRC used in connection with its coin shop business. Defendant Joshua Rust used these bank accounts to receive sales revenue and pay expenses in connection with

21

RRC's coin shop business. At various times during the Relevant Period, defendant Joshua Rust transferred money from these RRC bank accounts to the bank accounts defendants Rust and RRC used for the Silver Pool, including the 7496 Account, in order to fund Ponzi payments to Silver Pool investors. Defendant Joshua Rust made these transfers at the request of defendant Rust. At the time defendant Joshua Rust made these transfers, Joshua Rust knew that the money would be used by defendants Rust and RRC to make payments to Silver Pool investors that Silver Pool investors thought would be funded by the sale of silver. In making these transfers, defendant Joshua Rust intended to assist defendants Rust and RRC make Ponzi payments to Silver Pool investors in furtherance of defendants Rust and RRC's fraudulent scheme.

55.     On a couple of occasions during the Relevant Period, defendant Joshua Rust requested and received transfers of money from the accounts defendants Rust and RRC used for the Silver Pool into the bank accounts defendant Joshua Rust used in connection with RRC's coin shop business. Defendant Joshua Rust requested and received these transfers to pay various expenses of RRC's coin shop business. In requesting and receiving these transfers, defendant Joshua Rust knew and understood that the money he was receiving consisted of money contributed by Silver Pool investors that those investors believed were used to purchase Silver.

5. Defendants Rust and RRC Provided Investors with False Account Statements that Depicted Fictitious Trading Activity and Misstated the Amount of Silver Defendants Rust and RRC Held in the Silver Pool

56.     Defendants Rust and RRC provided Silver Pool investors with account statements that purported to show each trade involving silver defendants Rust and RRC executed on behalf of the Silver Pool. Specifically, these statements purported to show the number of ounces of silver involved in each sale, the price at which defendants Rust and RRC sold silver, the price at

22

which defendants Rust and RRC repurchased the silver, and the number of ounces by which the

Silver Pool's holdings of silver increased as a result of the trade.

57.     According to these account statements, defendants Rust and RRC successfully

sold silver at a higher price than they subsequently repurchased it on every single trade they

executed on behalf of the Silver Pool. According to these account statements, defendants Rust

and RRC increased the number of ounces held in the Silver Pool on every trade they executed.

58.     These Silver Pool account statements were false. Defendants Rust and RRC

never executed the sales and repurchases of silver listed in each account statement. In addition,

defendants Rust and RRC occasionally provided investors with account statements that listed

inconsistent trade details (such as price and quantity) for the same trade dates, despite

defendants' Rust and RRC representation that they traded a single account on behalf of the entire

Silver Pool.

59.     These false account statements misrepresented the number of ounces of silver

allocated to individual investors in the Silver Pool. As a result of these false account statements,

Silver Pool investors believed they owned a share in the Silver Pool equal to the value of the

number of ounces of silver indicated on the account statements and that defendants Rust and

RRC were storing silver on their behalf at Brink's storage facilities in Salt Lake City and/or Los

Angeles. In fact, defendants Rust and RRC did not hold or possess, either on behalf of Silver

Pool investors or in their own names, the number of ounces of silver indicated on the account

statements.

60.     Defendants Rust and RRC prepared and disseminated to Silver Pool investors

false account statements that contained the false and misleading information described above

23

throughout the Relevant Period. In fact, the account statements defendants Rust and RRC prepared and disseminated to Silver Pool investors in 2008 closely resembled the form of the account statements they prepared and disseminated to Silver Pool investors in 2018 and contained similarly false information regarding trades defendants Rust and RRC claimed to have executed on behalf of the Silver Pool and the value of individual investors' shares in the Silver Pool.

61.     Defendants Rust and RRC knew these account statements were false when they prepared and disseminated them to Silver Pool investors. Defendants Rust and RRC prepared and disseminated these false account statements in order to perpetrate and conceal their fraud from Silver Pool investors.

**B.     Specific Examples of Defendants' Fraud**

62.     Defendants Rust and RRC's fraudulent scheme, and the specific misrepresentations and misleading omissions they made to investors and prospective investors to solicit contributions to the Silver Pool, are illustrated by the following examples.

1.     Defendants Rust and RRC Made Fraudulent Misrepresentations and Omissions to Silver Pool Investor D.C.

63.     Silver Pool investor D.C. is a Utah resident. In or around August 2017, D.C.'s friend and business associate, L.F., told him about Rust's Silver Pool. L.F. told D.C. that L.F. had been investing with Rust in the Silver Pool for approximately two years and had obtained good results.

64.     On August 9, 2017, D.C. invested $150,000 in defendants Rust and RRC's Silver Pool via two separate checks both payable to RRC. On January 22, 2018, D.C. invested an additional $400,000 in defendants Rust and RRC's Silver Pool, via check payable to RRC.

24

65.     In May 2018, D.C. met in person with Rust at RRC's retail store in Salt Lake

City, Utah to learn more about the Silver Pool.

66.     During this May 2018 meeting, defendants Rust and RRC made the following

misrepresentations to D.C. about the Silver Pool:

        a.     Defendants Rust and RRC use funds contributed to the Silver Pool to
        purchase physical silver.  Defendants Rust and RRC store the silver they
        purchase for the pool with a local company.

        b.     Defendant Rust uses an independent auditor to verify that the amount of
        silver shipped to the storage facility matches what defendants Rust and
        RRC purchased with investor funds.

        c.     Defendants Rust and RRC trade the silver held in the Silver Pool to
        generate investment returns for investors.

        d.     Defendants Rust and RRC's trading strategy is to sell the silver held in the
        Silver Pool when prices in the silver market go up.  After prices in the
        silver market have come back down, defendants Rust and RRC buy silver
        back at a lower price with the proceeds of the sale, thus increasing the
        amount of silver held in the Silver Pool.

        e.     Using this trading strategy, defendants Rust and RRC have generated
        returns averaging between fifteen percent and twenty-five percent per
        year.

        f.     Defendants Rust and RRC typically generate a profit from each sale and
        repurchase of silver they make.  Only on a few rare occasions have
        defendants Rust and RRC made trades that did not generate a profit.

67.     After the May 2018 meeting with defendant Rust, D.C. made four more

contributions to the Silver Pool. On May 9, 2018, D.C. contributed $500,000 to the Silver Pool

via check payable to RRC, which defendants Rust and RRC deposited in the 7496 Account. On

May 16, 2018, D.C. contributed $1,000,000 to the Silver Pool via internal bank transfer to the

7496 Account. On May 23, 2018, D.C. contributed $500,000 to the Silver Pool via wire transfer

to the 7496 Account. And on June 1, 2018, D.C. contributed $500,000 to the Silver Pool via

check payable to RRC, which defendants Rust and RRC deposited in the 7496 Account.

68.     As of June 1, 2018, D.C. had contributed a total of $3,050,000 to the Silver Pool.

69.     D.C. did not receive an offering circular or prospectus prior to (or after) contributing money to the Silver Pool.

70.     D.C. had no involvement in the Silver Pool investment opportunity other than providing investment funds.

71.     D.C. received monthly account statements from defendants Rust and RRC for the months of July 2018 and August 2018. These statements purported to show the quantity of silver allocated to D.C.'s share in the Silver Pool, including the quantity of silver added to his investment as a result of defendants Rust and RRC's trading activity. According to these statements, defendants Rust and RRC executed one trade in June 2018, nine trades in July 2018, and six trades in August 2018. These statements indicate the date of each sale and corresponding repurchase of silver executed by defendants Rust and RRC during the relevant month, the quantity sold and repurchased, the price per ounce paid by defendants Rust and RRC in each sale and repurchase, the total value of the amount of silver sold and purchased, and the increase in the number of ounces of silver allotted to D.C.'s share in the Silver Pool. According to these statements, defendants Rust and RRC increased the number of ounces allotted to D.C. in every sale and repurchase of silver they executed on behalf of the Silver Pool.

72.     The July and August 2018 statements defendants Rust and RRC provided to D.C. were false. Defendants Rust and RRC did not engage in the trades depicted on the statements. Defendants Rust and RRC did not increase the amount of silver D.C. owned through his investment in the Silver Pool as reflected in these statements.

26

73.     On or about August 31, 2018, D.C. asked Rust to return $1.5 million of D.C.'s share in the Silver Pool. At this time, according to the statements provided by defendants Rust and RRC, D.C.'s share in the Silver Pool totaled $3,189,433.80. D.C. told Rust he needed the funds by September 12, 2018.

74.     Even though the Silver Pool account statements provided by Rust to D.C. indicated that defendants Rust and RRC sold at least $1.5 million worth of silver on six dates in August 2018, and had funds available to repurchase silver within at most four days of the sale, Rust told D.C. that it would be difficult to liquidate $1.5 million of D.C.'s share of the Silver Pool by September 12, 2018.

75.     In three separate wire transfers in September and October 2018, defendants Rust and RRC paid to D.C. an amount equal to the total amount of D.C.'s original contributions to the Silver Pool plus an additional amount intended to represent interest on the amount of those original contributions.

        2.     Defendants Rust and RRC Made Fraudulent Misrepresentations and
               Omissions to Silver Pool Investor H.H.

76.     Investor H.H. is a Utah resident. H.H. was employed by RRC as an Information Technology Specialist from July 2017 to July 2018. H.H. provided IT services to both RRC and R Legacy Entertainment, as well as other entities owned and controlled by Rust.

77.     As part of H.H.'s compensation package, defendants gave H.H. a $35,000 share in the Silver Pool. Defendants Rust and RRC explained to H.H. that they receive funds from investors to purchase physical silver and trade that silver to generate profits for investors.

78.     Shortly after H.H. began working for RRC, H.H. explored making an additional

27

investment in the Silver Pool with his own funds. In early July 2017, H.H. met with Rust at

RRC's retail store in Salt Lake City to discuss this additional investment. During this meeting,

defendants Rust and RRC made the following misrepresentations to H.H. about the Silver Pool:

a.    Defendants Rust and RRC collect money contributed by investors and pool that money to purchase physical silver on behalf of the Silver Pool;

b.    Defendants Rust and RRC actually possess the silver they purchase on behalf of the Silver Pool and use Brink's to transport, secure, and store the silver;

c.    Defendants Rust and RRC generate trading profits for the Silver Pool by selling silver and then repurchasing it at a lower price in order to increase the number of ounces of silver held in the Silver Pool;

d.    Specifically, defendants Rust and RRC receive information from a large global bank regarding when market participants intend to sell large quantities of silver and drive down the market price of silver. After receiving this information, defendants Rust and RRC sell approximately half of the silver held in the Silver Pool. After the market price of silver falls, defendants Rust and RRC use the proceeds from the sale of the silver to repurchase silver at the lower price;

e.    Defendants Rust and RRC trade silver on behalf of the Silver Pool through HSBC Bank;

f.    Defendants Rust and RRC measure the trading profits they generate through silver trading as the increase in the number of ounces generated by their sale and repurchase of silver. Defendants have never generated annual returns less than twenty percent and have generated annual returns as high as seventy percent; and

g.    Over the three years prior to the meeting with H.H., defendants Rust and RRC generated annual trading profits between twenty-two and twenty-six percent each year.

79.    Following this meeting with Rust, H.H. decided to invest an additional $96,000 in

the defendants Rust and RRC's Silver Pool. On or about July 6, 2017, H.H. hand-delivered a

cashier's check to Rust in the amount of $96,000 made payable to RRC, which defendants Rust

and RRC deposited in the 7496 Account.

80.    By July 7, 2017, defendants Rust and RRC disbursed all the money in the 7496 Account, including the money contributed by H.H. Between July 5th and July 7th, 2017, defendants Rust and RRC used the money in the 7496 Account to make payments to other investors; to fund transfers to Rust's other businesses, including Relief Defendants R. Legacy Entertainment and R. Legacy Racing; and to fund transfers to other accounts in the name of RRC, including the 3564 Account. Although defendants Rust and RRC later sent some money from the 3564 Account to Jack Hunt Coin Broker, Inc. ("Jack Hunt"), a wholesale precious metals dealer, the amount they sent to Jack Hunt was far less that the $96,000 contributed by H.H.

81.    H.H. did not receive an offering circular or prospectus prior to (or after) investing in the defendants Rust and RRC's Silver Pool. H.H. did not receive a written agreement outlining the terms of his Silver Pool investment.

82.    Prior to accepting funds, Rust did not ask H.H. about the source of his funds, his risk tolerance, or his net worth.

83.    H.H. had no involvement in the Silver Pool other than providing investment funds.

84.    Defendants Rust and RRC provided H.H. with a total of eight account statements that purportedly depicted defendants Rust and RRC's trading activity on behalf of the Silver Pool and the value of H.H.'s investment. H.H. received account monthly statements for July through October 2017, and January through April 2018.

85.    In each of these ten months, H.H.'s account statements show an increase every

29

month in the number of ounces of silver purportedly owned by H.H. through his investment in

the Silver Pool. According to these statements, H.H. began with 8,074 ounces of silver in

July 2017 and owned 10,209 ounces by April 2018. The value of H.H.'s share in the Silver Pool,

according to these statements, increased from $131,000 to $176,077.72, a gain of approximately

thirty-four percent. The Silver Pool account statements provided by defendants Rust and RRC to

H.H. were false, and the investment returns reflected in them were fictitious. At no time between

July 2017 and April 2018 did defendants Rust and RRC trade physical silver as shown in H.H.'s

Silver Pool account statements.

86.     In July 2018, RRC terminated H.H.'s employment for reasons unrelated to H.H.'s

involvement in the Silver Pool. On August 6, 2018, H.H. went to RRC's retail store in Salt Lake

City to discuss with Rust his participation in the Silver Pool in light of his termination.

87.     During this August 6, 2018, meeting, defendants Rust and RRC made further

misrepresentations to H.H about the Silver Pool, including:

        a.      that over the past thirty years, defendants Rust and RRC have consistently
                  generated annual returns of twenty to twenty-five percent from trading
                  physical silver in the manner they previously described to H.H.
                  Defendants Rust and RRC further told H.H. that in his worst year they
                  generated an annual return of twelve percent. Defendants Rust and RRC
                  told H.H. that over the last five years, the lowest annual return they
                  generated was forty percent;

        b.      that defendants Rust and RRC hold the physical silver owned on behalf of
                  the Silver Pool at Brink's facilities in Salt Lake City, Utah and Los
                  Angeles, California;

        c.      that defendants Rust and RRC trade the silver they own on behalf of the
                  Silver Pool through a single account with HSBC Bank; and

        d.      that defendants Rust and RRC receive information from a commodity
                  analyst at a large global bank regarding anticipated movements in the
                  price of silver and use this information to sell silver and repurchase it at a

lower price.

88.     At the August 6, 2018, meeting, defendants Rust and RRC told H.H. that to liquidate his share in the Silver Pool, he could either (1) take possession of the physical silver purchased with H.H.'s investment funds, (2) take possession of gold and silver eagles (coins) in an equivalent value, or (3) cash out the investment.

89.     On or about August 14, 2018, H.H. made a request to defendants Rust and RRC via telephone to liquidate his share in the Silver Pool in the form of cash. Approximately three weeks later, H.H. received a wire transfer from RRC in the amount of $171,793.02, which purportedly included the $35,000 defendants Rust and RRC told H.H. they contributed to the Silver Pool as part of H.H.'s compensation, the $96,000 H.H. contributed himself, and investment gains purportedly resulting from defendants Rust and RRC trading and reflected in the account statements defendants Rust and RRC provided to H.H. Defendants Rust and RRC did not sell silver to fund this wire transfer to H.H.; instead, defendants Rust and RRC used money recently contributed by two other investors.

## C.     Defendants Rust and RRC Continued To Solicit New Investors for Their Fraudulent Scheme At Least Through November 15, 2018

90.     Defendants Rust and RRC continued to solicit new investors for the Silver Pool at least through November 15, 2018 by making the same misrepresentations and omitting the same material facts as described above. In addition, defendants Rust and RRC continued, at least through November 15, 2018, to make these misrepresentations and misleading omissions to current Silver Pool investors, misappropriate Silver Pool investor funds, and provide existing Silver Pool investors with false account statements that misrepresent the value of their interest in the Silver Pool.

31

91.     For example, on September 6, 2018, defendants Rust and RRC solicited an FBI

Special Agent posing as a prospective investor in the same manner as they solicited investors and

prospective investors throughout the Relevant Period. At a meeting at RRC's retail store in Salt

Lake City, Utah, defendants Rust and RRC falsely stated to this FBI Special Agent:

  a.     that all trades defendants Rust and RRC executed on behalf of the Silver
         Pool involved actual physical silver defendants Rust and RRC possessed
         and stored in Brink's storage facilities in Salt Lake City, Utah and Los
         Angeles, California, and that defendants Rust and RRC were in possession
         of, as of September 6, 2018, approximately $77 million in silver held in
         these storage facilities, when in fact defendants Rust and RRC had no
         silver stored with Brink's;

  b.     that defendants Rust and RRC would use money contributed to the Silver
         Pool by new investors to purchase additional silver for the Silver Pool,
         when in fact defendants Rust and RRC used new contributions to make
         payments to existing investors and fund transfers to defendant Rust's other
         businesses, only occasionally sending money to precious metals dealers;

  c.     that defendants Rust and RRC had an account with HSBC Bank through
         which Rust traded silver on behalf of the Silver Pool, when in fact, neither
         Rust nor RRC had a trading account with HSBC;

  d.     that Rust had a "very good personal relationship" with a commodity
         analyst at a global bank, who provided Rust with information regarding
         the price levels at which market participants purportedly would sell silver
         into the market and drive down the market price, allowing defendant Rust
         to sell silver held in the Silver Pool and repurchase it at lower price;

  e.     that investors in the Silver Pool could expect returns of approximately
         twenty to twenty-five percent from defendants Rust and RRC's trading,
         and defendants Rust and RRC had generated returns as high as 112
         percent within the five years prior to September 6, 2018, when in fact,
         defendants Rust and RRC did not sell and then repurchase silver as
         described and never generated such investment returns; and

  f.     any request by an investor to liquidate his or her share in the Silver Pool
         would be funded by selling silver defendants Rust and RRC held in the
         Silver Pool, when in fact defendants Rust and RRC funded such requests
         using new contributions from new and existing Silver Pool investors.

32

**D.** **Defendant Rust Acted as a Controlling Person for defendant RRC**

92.     At all times during the Relevant Period, defendant Rust was RRC's owner, sole director, president, and registered agent.

93.     During the Relevant Period, defendant Rust made all financial and strategic business decisions for defendant RRC.

94.     During the Relevant Period, defendant Rust directed, among other things, the opening of bank accounts and signing of documents on behalf of defendant RRC. In addition, defendant Rust was a signatory on each of defendant RRC's bank accounts.

95.     Defendant Rust knowingly induced defendant RRC's fraudulent acts by virtue of directing those fraudulent acts.

**E.** **Defendant Rust Acted as an Agent for defendant RRC**

96.     Defendant Rust acted as an agent for defendant RRC. He solicited investors on behalf of RRC, generated Silver Pool account statements on behalf of RRC, and handled all Silver Pool investor funds received by RRC. As the owner, sole director, president, and registered agent of RRC, Rust acted on behalf of RRC.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I – AGAINST ALL DEFENDANTS

### FRAUD

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2018)**

97.     The allegations in paragraphs 1 through 96 are re-alleged and incorporated herein by reference.

98.     By reason of the conduct described above, defendants Rust and RRC, since August 15, 2011, in connection with a contract of sale of commodities in interstate commerce, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (2) made, or attempted to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon participants in the Silver Pool.

99.     By reason of the foregoing, defendants Rust and RRC have violated and continue to violate 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

100.    By reason of the conduct described above, defendants Denise Rust and Joshua Rust, since August 15, 2011, in connection with a contract of sale of commodities in interstate commerce, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or (2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon participants in the Silver Pool.

34

101. By reason of the foregoing, defendants Denise Rust and Joshua Rust have violated and continue to violate 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1), (3).

102. At all times relevant to this Complaint, defendant Rust controlled defendant RRC, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, defendant RRC's conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), defendant Rust is liable for RRC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

103. At all times relevant to this Complaint, defendant Rust acted within the course and scope of his employment, agency, or office with RRC. Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018), RRC is liable as principal for Rust's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

104. Each act of using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; making, or attempting to make, any untrue or misleading statements of material fact or omissions of material fact; or engaging, or attempting to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon participants in the Silver Pool, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT II – AGAINST DEFENDANTS DENISE RUST AND JOSHUA RUST

### FRAUD

**Aiding and Abetting Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2018)**

105.    The allegations in paragraphs 1 through 96 are re-alleged and incorporated herein by reference.

106.    By reason of the conduct described above, defendants Rust and RRC, since August 15, 2011, in connection with a contract of sale of commodities in interstate commerce, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (2) made, or attempted to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon participants in the Silver Pool.

107.    By reason of the conduct described above, defendants Denise Rust and Joshua Rust willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of 7 U.S.C. §9(1) (2012) and 17 C.F.R. § 180.1(a)(1)-(3) (2018) committed by defendants Rust and RRC or acted in combination or concert with defendants Rust and RRC. Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012), defendants Denise Rust and Joshua Rust are therefore responsible as if they were principals for defendants Rust and RRC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) since August 15, 2011.

108.    Each act of using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; making, or attempting to make, any untrue or

36

misleading statements of material fact or omissions of material fact; or engaging, or attempting

to engage, in acts, practices, or courses of business, which operated or would have operated as a

fraud or deceit upon participants in the Silver Pool for which defendant Denise Rust or Joshua

Rust provided assistance to defendants Rust and RRC is alleged as a separate and distinct

violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) for which Denise Rust and Joshua

Rust are responsible as if they were principals under 7 U.S.C. § 13c(a).

## VI.   VIOLATIONS OF THE UTAH UNIFORM SECURITIES ACT

### COUNT III – AGAINST DEFENDANTS RUST AND RRC

### MISREPRESENTATIONS AND OMISSIONS MADE IN CONNECTION WITH THE OFFER AND SALE OF SECURITIES

#### Violations of Section 61-1-1(2) of the UUSA
#### (Brought by Plaintiff State of Utah)

109.    The allegations in paragraphs 1-96 are re-alleged and incorporated herein by

reference.

110.    Section 61-1-1(2) of the UUSA makes it unlawful:

> for any person, in connection with the offer, sale, or purchase of
> any security, directly or indirectly to:
> . . .
> make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in
> the light of the circumstances under which they are made, not
> misleading.

111.    As described herein, defendants Rust and RRC have violated and continue to

violate Section 61-1-1(2) of the UUSA by, among other things, (i) telling investors that their

funds would be used to purchase physical silver which would secure the investment and be

stored at Brinks, when in fact, the majority of investor funds were used to pay Rust's personal

37

and business expenses, and to pay prior investors, and Brinks was not storing silver in that

quantity for the defendants Rust and RRC, and had no contract with defendants Rust and RRC to

do so; (ii) telling investors that half of the physical silver purchased with their investment funds

would be traded by Rust through a commodity account with HSBC bank, when in fact, the

defendants Rust and RRC had no account with HSBC; (iii) failing to tell investors that the

defendants Rust and RRC were not licensed in the securities industry; (iv) failing to provide

investors with any disclosure documents such as a prospectus or offering circular.

112. Each untrue statement of a material fact or omission of a material fact, including

but not limited to those specifically alleged herein, is alleged as a separate violation of Section

61-1-1(2) of the UUSA.

## COUNT IV – AGAINST ALL DEFENDANTS

### ACT, PRACTICE, OR COURSE OF BUSINESS WHICH OPERATED AS A FRAUD OR DECEIT

#### Violations of Section 61-1-1(3) of the UUSA
#### (Brought by Plaintiff State of Utah)

113. The allegations in paragraphs 1-96 are re-alleged and incorporated herein by

reference.

114. Section 61-1-1(3) of the UUSA makes it unlawful:

> for any person, in connection with the offer, sale, or purchase of
> any security, directly or indirectly to:
> . . .
> engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person.

115. As described herein, defendants Rust, RRC, Denise Rust, and Joshua Rust have

violated and continue to violate Section 61-1-1(3) of the UUSA by, among other things, using

investor funds for purposes not disclosed to investors or approved by investors, such as for

Defendants' personal and business expenses, and payments to prior investors.

116. Each act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person, including but not limited to those specifically alleged herein, is

alleged as a separate violation of Section 61-1-1(3) of the UUSA.

### COUNT V – AGAINST DEFENDANT GAYLEN RUST

### UNLICENSED BROKER-DEALER/AGENT

#### Violations of Section 61-1-3 of the UUSA
#### (Brought by Plaintiff State of Utah)

117. The allegations in paragraphs 1-96 are re-alleged and incorporated herein by

reference.

118. Section 61-1-3(1) of the UUSA makes it unlawful "to transact business in this

state as a broker-dealer or agent unless the person is licensed under this chapter."

119. As described herein, defendant Rust has violated and continues to violate Section

61-1-3(1) of the UUSA by, among other things, offering and selling RRC securities in and from

the State of Utah, in return for compensation from defendant RRC, without a license.

### COUNT VI – AGAINST DEFENDANT RRC

### EMPLOYING AN UNLICENSED AGENT

#### Violation of Section 61-1-3 of the UUSA
#### (Brought by Plaintiff State of Utah)

120. The allegations in paragraphs 1-96 are re-alleged and incorporated herein by

reference.

121. Section 61-1-3(2)(a) of the UUSA makes it unlawful "for a broker-dealer or issuer

39

to employ or engage an agent unless the agent is licensed."

122.     As described herein, defendant RRC has violated and continues to violate Section 61-1-3(2)(a) of the UUSA by, among other things, employing or engaging Rust to offer and sell RRC securities in and from the State of Utah, while defendant Rust was unlicensed.

### COUNT VII – AGAINST DEFENDANTS RUST AND RRC

### UNREGISTERED SECURITIES

### Violation of Section 61-1-7 of the UUSA
### (Brought by Plaintiff State of Utah)

123.     The allegations in paragraphs 1-96 are re-alleged and incorporated herein by reference.

124.     Section 61-1-7 of the UUSA makes it unlawful "for any person to offer or sell any security in this state unless it is registered under this chapter, the security or transaction is exempted under Section 61-1-14, or the security is a federal covered security for which a notice filing has been made pursuant to the provisions of Section 61-1-15.5."

125.     As described herein, defendants Rust and RRC have violated and continue to violate Section 61-1-7 of the UUSA by offering and selling securities in Utah that are not registered under the UUSA, that are not exempted under Section 61-1-14, and that are not federal covered securities for which a notice filing has been made.

### VII.  RELIEF REQUESTED

The Commission and the State of Utah respectfully request that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.     Find that Rust and RRC violated Section 6(c)(1) of the Commodity Exchange

40

Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2018);

B.    Find that Denise Rust and Joshua Rust violated Section 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2018);

C.    Find that Denise Rust and Joshua Rust responsible as if they were principals pursuant to Section 13(a) of the Act, 7 U.C.C. §13c(a) (2012), for violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2018);

D.    Find that Rust and RRC violated Sections 61-1-1(2), 61-1-1(3), 61-1-3, and 61-1-7 of the UUSA;

E.    Find that Denise Rust and Joshua Rust violated Section 61-1-1(3) of the UUSA

F.    Enter an order of permanent injunction enjoining Rust, RRC, Denise Rust, and Joshua Rust, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from violating 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) as well as Sections 61-1-1(2), 61-1-1(3), 61-1-3, and 61-1-7 of the UUSA.

G.    Enter an order of permanent injunction restraining and enjoining Rust, RRC, Denise Rust, and Joshua Rust and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

41

1)   Trading on or subject to the rules of any registered entity (as that term is

     defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2)   Entering into any transactions involving "commodity interests" (as that

     term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)), for accounts

     held in the name of any defendant or for accounts in which any defendant

     has a direct or indirect interest;

3)   Having any commodity interests traded on any defendant's behalf;

4)   Controlling or directing the trading for or on behalf of any other person or

     entity, whether by power of attorney or otherwise, in any account

     involving commodity interests;

5)   Soliciting, receiving, or accepting any funds from any person for the

     purpose of purchasing or selling any commodity interests;

6)   Applying for registration or claiming exemption from registration with the

     CFTC in any capacity, and engaging in any activity requiring such

     registration or exemption from registration with the CFTC except as

     provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018);

7)   Acting as a principal (as that term is defined in Regulation 3.1(a),

     17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any

     person registered, exempted from registration, or required to be registered

     with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9); and

8)   Associating with a licensed broker-dealer or investment adviser in Utah,

     pursuant to Section 61-1-20 of the UUSA.

H.  Enter an order directing Rust, RRC, Denise Rust, and Joshua Rust, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act or Regulations, or Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein, from November 6, 2013, to the present, including pre-judgment and post-judgment interest.

I.  Enter an order directing Relief Defendants R Legacy Entertainment, R. Legacy Racing, R. Legacy Investments, and Aleesha Franklin, including any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act or Regulations, or Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein, from November 6, 2013, to the present, including pre-judgment and post-judgment interest;

J.  Enter an Order requiring Rust, RRC, Denise Rust, and Joshua Rust to make restitution, pursuant to such procedure as the Court may order, to persons who have sustained losses proximately caused by Defendants' violations of the Act or Regulations, or Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein, including pre-judgment and post-judgment interest;

43

K.  Enter an order directing Rust, RRC, Denise Rust, and Joshua Rust to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the investors whose funds were received by Defendants as a result of Defendants' violations of the Act or Regulations, or Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein;

L.  Enter an order directing Rust, RRC, Denise Rust, and Joshua Rust to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, title VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act or Regulations, as described herein, from November 6, 2013, to the present;

M.  Enter an order requiring Rust, RRC, Denise Rust, and Joshua Rust to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012);

N.  Enter an order appointing a receiver; and

O.  Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

44

Dated: December 6, 2018

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By: /s/Thomas L. Simek
Thomas L. Simek
tsimek@cftc.gov
Jennifer J. Chapin
jchapin@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700

**SEAN D. REYES**
**UTAH ATTORNEY GENERAL**

By: /s/Robert G. Wing
(*signed by filing attorney with permission*)
Thomas M. Melton
tmelton@agutah.gov
Robert Wing
rwing@agutah.gov
Jennifer Korb
jkorb@agutah.gov
Paula Faerber
pfaerber@agutah.gov
Assistant Attorneys General
Attorneys for Plaintiff
STATE OF UTAH DIVISION OF SECURITIES
Utah Attorney General Office
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
(801) 366-0310

45